**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Rickey Lee HARRIS, Defendant–Appellant.**

No. 89–1984.

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1990.

Decided Sept. 27, 1990.

Rehearing Denied Oct. 24, 1990.

Maxine A. White, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Thomas L. Shriner, Jr., Brian W. McGrath, Foley & Lardner, Dennis P. Coffey, Coffey, Coffey & Geraghty, Milwaukee, Wis., for defendant-appellant.

Before BAUER, Chief Judge, and CUMMINGS and MANION, Circuit Judges.

BAUER, Chief Judge.

This appeal from a conviction for armed bank robbery presents us with the interesting issue of whether an attorney's out-of-court statements may be offered against a defendant as the statements of an agent on behalf of his principal under Federal Rule of Evidence 801(d)(2)(D). Although there are significant policy concerns which must be considered before the admission of such statements, we believe these concerns are not seriously implicated under the facts of this case and therefore affirm.

## I. Background

On November 2, 1988, shortly after 11:00 in the morning, a young black male dressed in a green army jacket, camouflage pants, gray wool cap and dark sunglasses, and wearing a bandana across his face, robbed the Reliance Savings and Loan in Milwaukee, Wisconsin. The robbery was not especially creative. The man walked up to a teller's window, pulled out a gun and demanded money. The teller, Lisa Wick,

handed the robber $505 in small bills from her drawer. Several of the bills were "bait money"—their serial numbers had been recorded to help identify any future use of the funds. The robber then fled from the building.

A few minutes later, Leslie Freeman, who lived a short distance from the savings and loan, encountered a young, black male standing in his garage. The man, who appeared extremely agitated, was holding a pair of camouflage pants and transferring a wad of bills from them into the pants he was wearing. The man spoke briefly with Freeman, then picked up a green Army jacket and the camouflage pants and left the garage. Freeman later identified Rickey Lee Harris, in a photo identification, as the man he discovered in his garage. That afternoon, Freeman and a Milwaukee police officer found the pants and the jacket, with some of the "bait money" in the jacket pocket, on Freeman's lawn. Other police officers found a pair of gloves, sunglasses, a gray wool cap, a green bandana and a knife in a baby carriage in Freeman's garage.

Five days after the robbery, on November 7, 1988, Milwaukee police arrested Rickey Lee Harris. After being taken to the station, Harris was given his *Miranda* warnings and informed of the evidence against him. Harris indicated that he would speak only with Special Agent Dan Craft, an FBI agent whom Harris apparently knew and trusted. When the agent arrived, Craft told Harris that he did not have to talk with him. Craft did not, however, re-read the formal *Miranda* rights. According to Craft and the Milwaukee police officers present at the time, Harris then confessed to the robbery of the Reliance Savings and Loan.

Harris was charged in the Eastern District of Wisconsin with one count of armed bank robbery in violation of 18 U.S.C. § 2113(a), and a second count of using and carrying a firearm in the commission of a crime of violence in violation of 18 U.S.C. § 924(c). Prior to trial, John Carlson, Harris' court-appointed attorney asked for and received permission from the court to withdraw as defense counsel. The court then appointed Dennis Coffey to serve as Harris' attorney at trial. A three-day jury trial began on February 27, 1989. The jury returned a verdict of guilty on the count of bank robbery on March 1. The district court sentenced Harris to 266 months imprisonment. Harris filed a timely notice of appeal.

## II. Discussion

Harris raises several challenges to his conviction. Only one, however, merits extended discussion: whether the trial court erred by admitting into evidence the out-of-court statements of Harris' former attorney. The resolution of this issue turns, in part, upon the determination of whether an attorney may be considered the agent of his client for purposes of the Federal Rules of Evidence.

This rarely litigated legal issue comes to us as the result of an unfortunate gambit by Harris' first appointed counsel, John Carlson. Apparently, in an attempt to develop Harris' defense, Carlson had visited Leslie Freeman, the "garage eyewitness," at work and showed him pictures of Harris' brother, James. The defense's theory was that James had committed the robbery and fled to Freeman's garage, and that Rickey Harris was simply a victim of mistaken identity. Freeman, however, upon reviewing the pictures, did not think James looked anything like his brother, and was confident that Rickey Harris, not James, was the man he saw in his garage. Freeman indicated this to Carlson during the visit at Freeman's office. Though defense counsel continued to pursue this mistaken identity theory, any reference to Carlson's visit was carefully buried. During Freeman's cross-examination, however, defense counsel asked Freeman if he had been asked to look at photographs other than the ones included in the photograph line-up from which he identified Harris. Freeman asked if this included attorneys. Defense counsel responded "sure." Freeman then explained that a man identifying himself as John Carlson, Harris' attorney, had visited Freeman at work and showed him a picture of Harris' brother James. On re-direct ex-

amination, Freeman explained that he was confident that Rickey Harris, not James, was the person he had talked to in his garage. This testimony effectively crushed the defense's theory that James had committed the robbery.

The court permitted Freeman to testify about Carlson's statements, over defense counsel's vigorous objections, holding that Carlson was an agent of the defendant acting within the scope of his agency when he visited Freeman, and that therefore Carlson's statements were not hearsay under Fed.R.Evid. 801(d)(2)(D). On appeal, Harris now contends that this use of his former attorney's statements was reversible error.

■■■ Fed.R.Evid. 801(d)(2)(D) provides that "[a] statement is not hearsay if … [t]he statement is offered against a party and is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of that relationship[.]" Under the traditional law of agency, the statements of an agent made in the course of the agency serve to bind the principal. Thus, such statements are presumably reliable in the absence of cross-examination because they are considered as if they were statements of the principal himself. *See United States v. DeOrtiz*, 907 F.2d 629, 636–38 (7th Cir.1990) (Bauer, C.J., concurring in the result). *See also United States v. Patel*, 879 F.2d 292, 293 (7th Cir.1989) (comparing agent-principal and co-conspirator statements as non-hearsay).

■■ An attorney *may be* the agent of his client for purposes of Rule 801(d)(2)(D). *See United States v. McClellan*, 868 F.2d 210, 215 n. 9 (7th Cir.1989). *See also United States v. Margiotta*, 662 F.2d 131 (2d Cir.1981). The unique nature of the attorney-client relationship, however, demands that a trial court exercise caution in admitting statements that are the product of this relationship. *See United States v. McKeon*, 738 F.2d 26, 30–33 (2d Cir.1984). As at least one circuit has noted, "the routine use of attorney statements against a criminal defendant risks impairment of the privilege against self-incrimination, the

right to counsel of one's choice and the right to effective assistance of counsel." *United States v. Valencia*, 826 F.2d 169, 172 (2d Cir.1987). Moreover, "the free use of prior [statements] may deter counsel from vigorous and legitimate advocacy" on behalf of his client. *McKeon*, 738 F.2d at 32. Thus, a more exacting standard must be demanded for admission of statements by attorneys under Rule 801(d)(2)(D), "in order to avoid trenching upon other important policies." *Id.*

■ Turning to facts of Harris' case, however, we are satisfied that these policies were not harmed by the admission of Carlson's statements. Carlson did withdraw as Harris' defense counsel, thus implicating the policies outlined in *Valencia* and *McKeon* concerning the effective assistance of the counsel of one's choosing. Carlson's withdrawal cannot be linked to the possible use of these out-of-court statements. If anything, Carlson's absence is the likely result of his becoming a possible witness in Harris' trial due to his unsuccessful gambit. Whatever the reason, however, Harris was effectively represented at trial and Carlson's withdrawal predated any discussion of the use of these statements.

Beyond this, Carlson's statements did not impair Harris' privilege against self-incrimination. These statements, and the inferences drawn from them, undermined the defense's theory of mistaken identity. They did not, however, force Harris to take the stand to rebut them. Carlson was not relating confidential information about his client to Freeman. Instead, he was testing a theory on behalf of his client. Harris' rights under the fifth amendment were burdened by allowing this testimony only to the extent that any damaging piece of evidence generally forces a defendant to present a competing explanation to the jury. This does not, however, violate the privilege against self-incrimination.

Finally, allowing Carlson's statements to be presented to the jury did not impair "vigorous and legitimate advocacy" on Harris' behalf. The defense continued to present its theory of mistaken identity and

the jury was free to accept this. They did not. Carlson gambled that Freeman would be confused by the picture of James Harris. He lost. Other attorneys will have to assess the risks of such a strategy in the future. We cannot say, however, that legitimate advocacy would be chilled by requiring lawyers to make such judgment calls. Effective advocacy requires strategic and tactical decisions at all levels of the criminal process. The fact that a lawyer's unsuccessful manuever might be used against his client will not unduly chill legitimate advocacy.

Nor does such a result conflict with the Second Circuit's holdings in *McKeon* and *Valencia*. In *McKeon*, 738 F.2d 26, the court was concerned with the admission of certain statements made by defense counsel in a previous *trial* which were now inconsistent with the defendant's current theory of defense. Thus, the court in *McKeon* was faced with various concerns not present here, including forcing criminal defendants to face a "Hobson's choice" between limiting their defense arguments at a later trial to ones offered at an earlier trial, or having any later arguments impeached with earlier ones. *See id.* at 32–33. *Valencia*, 826 F.2d 169, was concerned with informal statements made by a defense attorney to a prosecutor during an off-the-record discussion of the defendant's case. As a matter of policy we encourage such open discussions to encourage swift administration of trials. This policy concern is obviously not seriously implicated

by the admission of statements elicited by an attorney on a gambit such as Carlson's visit to Freeman. We must also note that, these differences from our case aside, the Second Circuit has narrowed the reach of *McKeon* and *Valencia* in *United States v. Arrington*, 867 F.2d 122 (2d Cir.1989), holding that despite the concerns raised about the use of attorney's out-of-court statements, no special procedures are required for the admission of such evidence. *Id.* at 128.

Carlson was acting as an agent of his client when he interviewed Freeman. He was his counsel of record and his statements were made within the scope of that relationship.[1] For purposes of Rule 801(d)(2)(D), therefore, these statements were technically not hearsay and were admissible against Harris. None of the policy concerns inherent in the lawyer-client relationship were infringed by admitting this evidence. Decisions on the admission of evidence are within the broad discretion of the trial judge, and we will only reverse such decisions upon a clear abuse of that considerable discretion. *See United States v. McNeese*, 901 F.2d 585 (7th Cir.1990). For purposes of determining whether the special policy concerns implicated by the admission of an attorney's statements as the agent of a client, we also must rely on the discretion of the trial judge and his or her close proximity to the parties involved. *Valencia*, 826 F.2d at 173. The admission of Carlson's out-of-court statements was not an abuse of this discretion.[2]

1. Harris objects that no independent evidence existed to demonstrate that Carlson actually visited Freeman or that Carlson was acting as Harris' agent at the time of such a visit and, thus, any recognition of a principal-agent relationship rests on the statements themselves. Harris concludes that such "bootstrapping" is impermissible under 801(d)(2)(D). *See Tippecanoe Beverages v. S.A. El Aguila Brewing Co.*, 833 F.2d 633, 635 (7th Cir.1987). There is, however, independent evidence that Carlson was Harris' agent—namely, his personal appearance before the court in his capacity as Harris' attorney. Thus, Harris' bootstrapping argument must fail.

2. Harris also contends that these statements violate the Confrontation Clause because the declarant was not subjected to cross-examination. If out-of-court statements are sufficiently reli-

able, however, they may be admitted absent cross-examination of the declarant. *See United States v. Garcia*, 897 F.2d 1413 (7th Cir.1990). Reliability may be inferred when the evidence in question falls within a firmly-rooted exception to the hearsay rule. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Thus, we have determined that the admission of a declarant's out-of-court statement is permissible under the Confrontation Clause where: (1) it is clear the declarant actually made the statement in question, and (2) there is circumstantial evidence supporting the truth of the statement. *See Garcia*, 897 F.2d at 1421. Reviewing the record we are satisfied that the evidence supports these indicia of reliability. The statements attributed to Carlson are consistent with the defense's theory of the case and Freeman, according to the district court, was

■ The remaining issues raised by Harris are not nearly as compelling. First, he contends that the court erred twice in admitting his confession into evidence: once by refusing to hold a hearing on his motion to suppress the confession, and again by not granting a new trial when the confession was admitted despite "newly presented evidence" at trial. Both claims are meritless. A hearing will not be held on a defendant's pre-trial motion to suppress merely because a defendant wants one. Rather, the defendant must demonstrate that a "significant, disputed factual issue" exists such that a hearing is required. *United States v. Sophie,* 900 F.2d 1064 (7th Cir.1990). Despite expending a great deal of paper and ink on the subject, Harris has articulated no evidence of such a factual dispute. Harris' unsupported allegation that he did not receive proper *Miranda* warnings is insufficient to warrant a hearing. Moreover, the series of questions Harris raises in his brief concerning the circumstances of his confession are just that—a series of questions. Not a single contention is backed up by clearly articulated factual charges. None is worthy of a hearing. The trial court did not err by refusing to hold a separate hearing on the request for suppression.

■ Like his demand for a hearing, Harris' contention that his confession was not voluntary must fail as well. Despite our persistent doubts about the efficacy of such an approach, *see United States v. Rutledge,* 900 F.2d 1127, 1128–29 (7th Cir. 1990), we review the voluntariness of a confession under a *de novo* standard. *See Wilson v. O'Leary,* 895 F.2d 378, 383 (7th Cir.1990). Here, reviewing the totality of the circumstances, we cannot say that Harris' confession was made under conditions that overwhelmed his will such that his statement was not the product of free choice. *See Rutledge,* 900 F.2d at 1129. He was placed in an ordinary room, given *Miranda* warnings, and interviewed for less than an hour. This is hardly sinister police procedure. Harris objects that he was threatened with false and misleading evidence, but even if this is the case, it is well settled that police may use small deceptions while interrogating witnesses. *Id.* at 1131 (citing *United States v. Guerrero,* 847 F.2d 1363, 1366–67 (9th Cir.1988)). Moreover, police are free to solicit confessions by offering to reduce the charges against the defendant. *See Rutledge,* 900 F.2d at 1130. Thus, Harris' complaint that he was coerced by Craft's offer of leniency regarding the state charges must fail as well. In fact, the state marijuana charges stemming from his arrest were dropped, indicating that the government lived up to the terms of any alleged deal to which Harris now objects. Harris' confession was voluntary and the district court did not err by admitting it into evidence, nor by refusing to hold a pre-trial suppression hearing.[3]

■ Finally, Harris contends that insufficient evidence existed to establish that Reliance Savings and Loan was a federally insured institution at the time of the robbery and thus the offense element contained in 18 U.S.C. § 2113(f) was not proven beyond a reasonable doubt. We would be hard pressed to conjure up a weaker claim. In *United States v. Taylor,* 728 F.2d 930, 933 (7th Cir.1984), we accepted as sufficient the testimony of a bank vice-president that the bank was federally insured—the *only* evidence presented on the issue. Here, the government offered the savings and loan's Certificate of Insurance from 1954, as well as extensive testimony from the bank president that the insurance premiums had been paid and that he knew

---

credible in his presentation of the conversation. The admission of these out-of-court statements did not violate Harris' constitutional rights under the Confrontation Clause.

**3.** Harris also contends that if he was denied a suppression hearing, it was only because of the ineffective assistance of counsel. Because we hold that he was not entitled to such a hearing,

his ineffective assistance claim must fail as well. Harris cannot demonstrate either the lack of "reasonable assistance" or "prejudice" mandated by *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *See McCall v. O'Grady,* 908 F.2d 170, 173 (7th Cir. 1990); *United States v. Myers,* 892 F.2d 642 (7th Cir.1989).

this because he reviewed the bank's payments by auditing the books. Harris contends that the bank president was not personally familiar with these payments and thus an employee should have been called to testify. We are confident that had an employee been called, we would now be reviewing Harris' claim that someone in a position of authority, say the bank president, should have been called to testify. Such speculation aside, there can be no doubt that the governnment met its burden of proving that Reliance was federally insured. A challenge to the sufficiency of the evidence will not succeed so long as "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *see also United States v. Garrett,* 903 F.2d 1105, 1109 (7th Cir.1990); *United States v. Briscoe,* 896 F.2d 1476 (7th Cir.1990). The boundaries of this standard are not even within shouting distance of Harris' challenge. We reject his claim of insufficient evidence.

### III. Conclusion

The district court did not abuse its discretion in determining that Harris' former defense attorney was acting as his agent when he interviewed Leslie Freeman, and therefore that the attorney's out-of-court statements were admissible under Fed.R. Evid. 801(d)(2)(D). Although there are several significant policy concerns that should be considered before accepting such testimony, we believe these concerns were not infringed here. Thus, the district court did not abuse its discretion in admitting the statements into evidence. By so concluding, however, we do not welcome broader use of attorney statements.

Beyond these considerations, the district court properly denied Harris' request for a hearing on his motion to suppress his confession. Finally, sufficient evidence existed to establish that Reliance was a federally insured institution at the time of the robbery. Thus, Harris' challenges are rejected, and his conviction is

AFFIRMED.