UNITED STATES of America, Plaintiff–Appellee,

v.

Willie Curtis SANDERS, Defendant–Appellant.

No. 91–2152.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1992.

Decided Oct. 28, 1992.

Rehearing Denied Dec. 15, 1992.

Barry R. Elden, Asst. U.S. Atty., Mark S. Hersh (argued), Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Edward M. Genson, Marc W. Martin, Leonard Goodman (argued), Genson, Stein-back, Gillespie & Martin, Chicago, Ill., for defendant-appellant.

Before COFFEY and FLAUM, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

FLAUM, Circuit Judge.

On October 27, 1989, Janet Catledge and Cheryl Davis drove into the parking lot of Mr. Philly's, a restaurant at 165th and Halsted. After examining what they thought was five kilograms of cocaine, they handed nearly ninety thousand dollars to a man they knew as Doc. As it turned out, the "cocaine" was plaster of Paris, and "Doc" was undercover DEA agent Calvin Holliday. Both women were arrested. In April of 1990, Catledge and Davis told a federal grand jury that Willie Curtis Sanders supplied the money for the buy. Sanders maintained his innocence and proceeded to trial where his two co-conspirators, Cat-ledge and Davis, testified against him. He appeals from his conviction and sentence for conspiracy and attempt to possess with intent to distribute cocaine. For the following reasons, we affirm.

I.

In 1989, Ricky King contacted Janet Cat-ledge who did not know that King was cooperating with the DEA in Florida. She agreed to find someone interested in buy-ing kilogram quantities of cocaine. This began what is sometimes called a reverse sting, in which the government catches drug dealers by posing as the seller, in-stead of as the buyer. Catledge contacted Cheryl Davis, characterized at trial as Sanders' girlfriend, and Davis communicat-ed the terms to Sanders. Over the course of five months, Catledge negotiated the main deal, that Sanders would buy five kilograms of cocaine from King, with deliv-ery in Chicago. Sanders agreed to the deal and brought the money to Davis' apart-ment. Final arrangements were made among King and the co-conspirators (and the DEA agents), and the women set off in separate cars for the restaurant parking lot.

There were several side agreements to the main deal. King agreed to pay Cat-ledge $2,500 for locating the buyer for him. Catledge and Davis agreed to misrepresent the price to Sanders, as $18,500 instead of $17,500 per kilogram, and split the addition-al $5000. Sanders agreed to pay Davis $3000 to take the risk of delivering the money to King's courier. King and the DEA agents agreed to misrepresent Agent Holliday as King's driver "Doc". This re-sulted in neither King nor Sanders being present during the attempted transfer of cash and drugs, although the deal was be-tween them. Nevertheless, none of this tangential wheeling and dealing created a reasonable doubt for the jury that Sanders was the buyer behind Catledge and Davis.

II.

The appellant argues that his con-viction should be overturned on four

grounds. The first is the trial court's error in admitting the testimony of Catledge and Davis regarding conversations they had with Sanders about cocaine prior to the conspiracy. Catledge testified that she thought Sanders would be interested in purchasing cocaine from King because he had asked her a few years earlier if she knew any suppliers. Specifically, Catledge discussed the price of kilograms of cocaine with Sanders in several conversations at his auto repair shop in 1987. Sanders asked, according to Catledge's testimony, if she knew anyone "[i]n Florida that was handling large quantities of cocaine." Tr. at 100.

Cheryl Davis testified that she asked Sanders what he meant when he mentioned "drywall" during a telephone conversation that she overheard. Sanders told her "drywall" was cocaine. Davis testified that she had heard Sanders use this term "[s]everal times" during telephone calls he placed from her apartment in the spring of 1989. Tr. at 354–55.

The trial court's decision to admit prior bad act evidence under Federal Rule of Evidence 404(b) is reviewed under an abuse of discretion standard. *United States v. Cox,* 923 F.2d 519, 523 (7th Cir.1991); *United States v. Zapata,* 871 F.2d 616, 621 (7th Cir.1989). Rule 404(b) permits the admission of evidence of other "crimes, wrongs, or acts" not to "prove [a person's] character in order to show action in conformity therewith," but for "proof of motive, opportunity, intent" or related purposes. Fed.R.Evid. 404(b). "The overall, governing criterion of [our] analysis ... is that there 'must have been a principled exercise of discretion' by the district court." *Zapa-*

ta, 871 F.2d at 621 (*quoting United States v. Beasley,* 809 F.2d 1273, 1279 (7th Cir. 1987)).

The district court in this case explained its reasons for admitting the evidence in some detail, referring to *Cox* specifically, addressing the appellant-defendant's challenges, and eliciting further argument from both sides. Catledge's testimony showed the context of her relationship with Sanders prior to the conspiracy and why she would seek out Sanders as a potential cocaine buyer. Davis' testimony, which concerned a specific conversation just weeks before the indicted activity, explained to the jury why she also considered Sanders a prospective cocaine buyer.[1] In both cases, the relevance to the charged conspiracy and the timing of the conversations convinced the trial court that the probative value outweighed any prejudicial impact. In addition, the trial court exercised its discretion in keeping out testimony regarding alleged petty drug transactions between Catledge and Sanders in the early 1980s, ruling that the time gap caused the prejudicial impact to outweigh the probative value of the evidence. The record shows a principled and canny exercise of discretion by the district court in admitting the testimonial 404(b) evidence.

The appellant's second argument concerns testimony that Sanders' former lawyer visited Catledge and Davis at the Metropolitan Correctional Center. Davis testified that a lawyer named Flader,[2] claiming to represent Sanders, asked them if they had made statements to the police. The appellant objected at the time, and the admissibility was discussed at sidebar. Later, outside of the jury's presence, the gov-

1. At the time of the district court's ruling on the matter, the appellant conceded that he had no argument to make regarding the admission of Davis' testimony. Tr. at 3. An objection without any support does not preserve an issue for appeal. *See, e.g., United v. Gonzalez,* 933 F.2d 417, 429 (7th Cir.1991). Otherwise, the appellate court would be forced to review matters that the district court had no opportunity to consider. The appellant's inclusion of an argument in his motion for a new trial came too late in the day to resurrect the issue. Accordingly, any challenge to the admission of Davis' testimony regarding "drywall" is reviewed under the

plain error standard. In any event, the district court's decision in this case meets the higher "abuse of discretion" standard with regard to Davis' testimony.

2. There seems to have been some question about the lawyer's name. In the trial transcript, he is referred to alternatively as Slater and Fleeter. Appellant's opening brief uses the name Slater. The government's brief and the appellant's reply brief, however, call him Flader, and that was the name used at oral argument.

ernment offered an appearance form filed by Flader on Sanders' behalf, and the appellant withdrew his objection to the testimony in order to prevent the admission of the form. The record shows that the government also wanted to offer the form to refute the implication, brought out on recross, that Flader knew both Sanders and another friend of Catledge and Davis whom the defense theorized as the true co-conspirator. The next day, the appellant moved to strike Davis' testimony regarding Flader.

The district court initially admitted the testimony after finding that it had probative value because it tended to prove Sanders' involvement in the conspiracy, especially on the heels of Davis' cross during which the defendant attempted to implicate another man as the third conspirator. The court considered the government's representations that Flader had filed an appearance on behalf of Sanders and had appeared at preliminary proceedings before concluding that the out of court statements were admissible under the party's agent exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(D). When the district court later denied the motion to strike the testimony, it specifically considered *United States v. Harris*, 914 F.2d 927 (7th Cir.1990). Remarking on the sensitivity with which the attorney/client relationship should be handled, the district court refused to admit the appearance form as long as the defendant did not contest the fact that Flader had been Sanders' lawyer.

In many ways, the situation in this case parallels the facts in the *Harris* case. In both cases, the lawyer spoke to the witness in order to develop a defense strategy. Both lawyers took a calculated risk in approaching an individual who might well testify against his client. The fact that the strategy backfired does not mean that advocacy will be chilled; lawyers constantly

make tactical decisions in preparation for trial, weighing the risks and benefits of each. Importantly, in both cases the defendant's trial counsel was not the lawyer about whose statements or actions the witness testified. Therefore, the effectiveness of the defendant's representation at trial was not compromised by the admission of the evidence. Moreover, the testimony did not impair the defendant's privilege against self-incrimination in either case; it simply "force[d the] defendant to present a competing explanation to the jury." *Harris*, 914 F.2d at 931. In this case, the defendant's explanation fit in neatly with the defense theory that the other man who knew Catledge and Davis also knew Flader and was the true co-conspirator.

On the other hand, one important fact distinguishes this case from *Harris:* Sanders had no need for a lawyer when Flader visited Davis, unless he conspired with the women. While the defendant in *Harris* had been arrested and charged before his lawyer visited the witness, Sanders would not be indicted until months later. Flader filed an appearance on his behalf in April, approximately five and a half months after Flader spoke with Davis at the MCC. The fact of Flader's representation, therefore, arguably "reveal[s Sanders'] motive for seeking legal advice." *Matter of Grand Jury Proceedings, Cherney*, 898 F.2d 565, 568 (7th Cir.1990).[3] As this circuit has held, where disclosure of a client's identity would "convey the substance of a confidential communication," the attorney/client privilege may be invoked to prevent such disclosure. *Id.* at 569.

The first prong of the appellant's argument, that the government presented no evidence to establish an agency relationship except for Flader's statement, is considerably weakened by his acquiescence at trial to the agency characterization. He agreed not to contest the existence of an

---

**3.** This case by no means presents the same level of difficulty we grappled with in *Matter of Grand Jury Proceedings*. That case involved a criminal defense lawyer who was subpoenaed to appear before a grand jury in order to disclose the identity of the individual who paid his fees for the narcotics conspiracy trial of another man. We affirmed the district court's decision to quash the subpoena because, under the special circumstances of that case, the disclosure of the fee payer's identity would reveal a confidential communication and thereby discourage individuals from seeking legal advice.

agency relationship as a strategic move to prevent the admission of the appearance form. Tr. at 523–27, 572–75. After having effectively prevented the government from proving up the agency relationship, either through the appearance form or by calling Flader to the stand, the appellant cannot contest the issue on appeal.

■ The second prong, that the statements by Flader were confidential communications and that the very fact of representation was a confidential communication, is waived because it was not raised in the trial court. Davis testified, without objection, that Flader visited her in the MCC and that he was Sanders' lawyer. Tr. at 479–80. Only when the government asked Davis what was said during the meeting did the appellant object, and the objection discussed at sidebar concerned only the hearsay nature of any statements made by Flader. Tr. at 480–84. Therefore, to the extent that identifying Flader as Sanders' lawyer disclosed a privileged communication, the appellant waived the privilege by failing to make a timely objection. The admission of Flader's statements did not pose a hearsay problem, and any attorney/client privilege objection to the statements is waived for failure to make a timely and specific objection on those grounds.

■ Even if the arguments had been properly preserved for appeal, the appellant failed to show error by the trial court. The admission of evidence under Rule 801(d)(2)(D), which covers out of court statements made by a party's agent, is reviewable under an abuse of discretion standard. "For purposes of determining whether the special policy concerns implicated by the admission of an attorney's statements as the agent of the client, we must also rely on the discretion of the trial court and his or her close proximity to the parties involved." *Harris*, 914 F.2d at 932. In this case, the district court considered the matter carefully, reviewed the *Harris* case and cogently explained its reasoning for admitting the evidence. In addition, the district court exercised discretion in refusing to admit the appearance form, once the defendant agreed not to challenge

the agency relationship, despite the insinuation on recross that Flader might have acted on behalf of someone else. The court explicitly based its refusal on the need to treat attorney/client information carefully and to restrict the admission of evidence stemming from the attorney/client relationship. Tr. at 571–75. In this case the admission of limited testimony about Flader was not an abuse of discretion.

Had the admission been an abuse of discretion, it would be harmless error. The jury had already heard substantial evidence about Davis being supported by Sanders; they could have interpreted Davis' testimony as Sanders' engagement of counsel on her behalf. In addition, this did not add significantly to the government's evidence against Sanders. The case boiled down to witness credibility, in large part. Davis (and Catledge) testified at length that Sanders was the buyer for whom they were acting. There is no reason to believe that the jury would be swayed by Davis' relatively brief testimony on this point while not finding her convincing on other matters.

Testimony about Flader's visit came during the redirect examination of Cheryl Davis. Nothing in the cross examination, however, directly prompted this line of inquiry. While the government is correct that the defendant did not object, at trial or on appeal, on the grounds that the questions were beyond the scope of the cross, we reiterate the concerns described in *United States v. Harris*, and caution the government that it should only offer this sort of evidence in rare cases and when absolutely necessary, in order to avoid impairing the attorney/client relationship, chilling full disclosure by a defendant to his lawyer, and detering defense counsel from "vigorous and legitimate advocacy." 914 F.2d at 931.

■ The appellant's third and fourth arguments on appeal are completely without merit. Sanders argues that the government improperly insisted on selling five kilograms, and no fewer, in order to invoke the mandatory ten-year minimum sentence. He asks that his sentence be declared unconstitutional because the government's "outrageous conduct" coerced him into ne-

gotiating for a larger amount of cocaine than he was predisposed to purchase. Preliminarily, we note that the appellant did not raise this argument at his sentencing, beyond a passing reference which inaccurately summarized the trial testimony, and therefore he has waived the issue on appeal. *See United States v. Mealy*, 851 F.2d 890, 906 (7th Cir.1988).

█ At any rate, the government's conduct in this case does not begin to approach coercion. A review of the taped telephone conversations and Catledge's testimony show that the conspirators discussed the price for five kilograms of cocaine from the beginning. Catledge raised the possibility of ten kilograms during two conversations with King, though she later explained it as a negotiating tactic. Tr. at 131–32. In addition, Catledge's testimony about her 1987 conversation with Sanders described his interest in a supplier of large, kilogram quantities. The only interest in smaller amounts came after the whole deal had been negotiated, on the day before the arrest.[4] Catledge testified that a cash problem caused the conspirators to ask if they could buy one kilogram first, ostensibly to test the quality. Tr. at 152. We agree with the government's characterization at argument that this defendant and his co-conspirators exhibited a predisposition to buy five or more kilograms "from the get-go."

█ Finally, the appellant contends that his sentence cannot be based on the amount of counterfeit cocaine used by the government at the controlled buy. This argument fails for two reasons. First, the defendant was convicted and sentenced for conspiracy and attempt, not possession or distribution, making the prop substance completely immaterial. Whether a defendant has conspired and attempted to possess a controlled substance can be determined without addressing whether he ever possessed it. Second, the defendant conspired to purchase cocaine and supplied money for cocaine; the government's pru-

dent use of plaster of paris does not change his ability and intent to buy the real thing. *Cf. United States v. Buggs*, 904 F.2d 1070, 1079 (7th Cir.1990) (sentencing courts should consider the *negotiated* amount of drugs "absent a determination that the defendant did not intend to or could not produce those amounts") (citations omitted). Incidentally, we appreciate the government's rationale that "using counterfeit rather than real cocaine in a reverse sting obviously avoids adding more cocaine to the marketplace in the event something goes wrong, such as a successful effort to steal the cocaine from the undercover operatives." Br. for U.S. at 27.

Because the challenged testimony was properly admitted, the government did not improperly inflate the mandatory minimum sentence, and the defendant's sentence was correctly determined, the appellant's conviction and sentence are

AFFIRMED.

---

**4.** While there is some evidence of Davis and Sanders initially asking to buy only three of the five kilograms (Tr. at 134) and Catledge telling Davis that she couldn't find any other buyer so they would have to buy all five (Tr. at 144), this sort of negotiating among co-conspirators has no effect on an analysis of the government's conduct or on the impression given to the government that these conspirators were ready to buy five kilograms.