In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3718

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDWARD T. JUNG,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 172—**Milton I. Shadur**, *Judge.*

ARGUED SEPTEMBER 21, 2006—DECIDED JANUARY 18, 2007

Before BAUER, CUDAHY, and WOOD, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury convicted Edward Thomas Jung of eight counts of wire fraud in violation of 18 U.S.C. § 1343 and two counts of securities fraud in violation of 15 U.S.C. §§ 77q(a) and 77x. Jung appeals, claiming that the district court erroneously admitted the out-of-court statements of his former attorney under Federal Rule of Evidence 801(d)(2)(D). Jung also challenges his sentence, arguing that the sentencing court failed to properly consider and apply 18 U.S.C. § 3553(a). For the following reasons, we affirm.

## I. Background

In 1993, Hollis Lamon, an Atlanta securities broker and promoter, decided to start a hedge fund and asked Jung to manage it. Shortly thereafter, Lamon and Jung formed a limited liability company called Strategic Income Fund, LLC ("SIF"). Fred Isaf acted as SIF's special counsel and drafted SIF's governing documents, which gave Jung the exclusive right and power to manage the fund.

The fund was designed to attract investors who wanted to generate additional income on stocks that they already owned. An investment in SIF cost $100,000 per unit, but most investors signed a promissory note and pledged stocks or bonds to collateralize the note. Investors were told that they would continue to receive the dividends and interest from their pledged collateral. The collateral was then transferred into a sub-account of E. Thomas Jung Partners, Ltd. ("ETJ"), which was a market-maker/broker-dealer on the Chicago Board Options Exchange ("CBOE"). The collateral enabled Jung to secure margin from LIT Clearing Services, Inc. ("LIT"), and Jung used the margin to buy and sell options. Profits generated by Jung's options trading on the SIF margin were to be distributed to SIF's investors.

From July 1994 to September 1998, Jung, Lamon, and others sold interests in SIF to 55 investors. Beginning in 1995, Jung sold investments in an almost identical fund called the Friends and Family Account ("FFA"). By the end of 1997, SIF's investors had invested more than $16.5 million. However, the combined net value of ETJ and its sub-accounts totaled just over $1 million. Despite the trading losses, Jung continued to pursue prospective investors. In order to keep ETJ in business and continue trading, Jung had to retain the collateral invested in the funds and pursue additional collateral from old and new

investors. By the end of August 1998, even though SIF's investors had contributed another $6.85 million that year, the total value of Jung's accounts totaled less than $3.4 million.

In September 1998, LIT demanded payment from Jung for the more than $22 million that ETJ had borrowed and lost. LIT had a security interest in all assets held in ETJ's accounts, which included the SIF and FFA investors' collateral. The $22 million debt consisted of Jung's personal trading loses, ETJ expenses, and cash withdrawals made by Jung. After LIT liquidated all of the assets in ETJ's account, Jung still owed LIT more than $1 million. On September 22, 1998, Jung's former attorney, James Fox, called Lamon and Isaf and told them that all of SIF's collateral in the ETJ sub-account, approximately $21.6 million, had been liquidated by LIT.

A federal grand jury returned a ten-count indictment against Jung on February 18, 2003. According to the indictment, Jung had defrauded investors through his hedge fund by falsely representing that their pledged assets would be used solely to collateralize trading on the investors behalf. Jung's jury trial began on January 13, 2004. At trial, the defense tried to establish that Jung reasonably believed that the investors were aware that their pledged assets cross-collateralized all of Jung's trading and that Jung did not intend to deceive anyone.

During its case-in-chief, the government introduced several pieces of evidence against Jung, including statements attributed to Fox. Over repeated objections by Jung's trial attorney, the district court admitted the statements as party-admissions under Federal Rule of Evidence 801(d)(2)(D). First, the district court allowed Isaf to testify that Fox had told him that "[Jung] had, if I remember the words exactly, engaged in improper and

illegal trading[1]." Second, the district court admitted a letter drafted by Isaf to SIF's investors stating that "[Jung's] lawyer informed me that [Jung] had engaged in 'improper and illegal trading activity' which he had concealed from Lamon and Stern, all SIF Members, and SIF's accountant." Third, the district court allowed Lamon to testify that Fox had told him that "Mr. Jung, unbeknownst to us, had another account. And he had taken, I believe was the word, our money and used it for his own personal benefit and lost it all trading." Finally, Lamon also testified that "Mr. Fox gave us papers that he said were written by Mr. Jung at the time that was, for lack of a better word, Mr. Jung's confession."

On February 5, 2004, the jury found Jung guilty on all ten counts in the indictment. Jung was sentenced to 109 months imprisonment and three years of supervised release and ordered to pay a special assessment of $1,000 and $21 million in restitution. Jung then filed this timely appeal.

## II. Discussion

On appeal, Jung brings two separate challenges. First, Jung argues that the district court erred in admitting into evidence the statements attributed to James Fox, his former attorney, as party admissions under Federal Rule of Evidence 801(d)(2)(D). Second, Jung argues that the sentence should be vacated because the district court did not properly consider and apply the sentencing factors under 18 U.S.C. § 3553(a).

---

[1] Although Fox testified that he did not tell Lamon or Isaf that Jung had engaged in unlawful or improper trading, Fox conceded during cross-examination that he could not remember the details of his conversations with Lamon or Isaf.

### A.  Admission of Attorney James Fox's Statements

A decision regarding the admission of evidence is within the broad discretion of the trial judge and will be overturned only upon a clear abuse of that considerable discretion. *United States v. Brandon*, 50 F.3d 464, 468 (7th Cir. 1995). Jung contends that the district court abused its discretion by admitting statements attributed to Fox under Rule 801(d)(2)(D), which provides that "[a] statement is not hearsay if . . . the statement is offered against a party and is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]" Fed. R. Evid. 801(d)(2)(D).

"An attorney *may be* the agent of his client for purposes of Rule 801(d)(2)(D)." *United States v. Harris*, 914 F.2d 927, 931 (7th Cir. 1990). But "[t]he unique nature of the attorney-client relationship . . . demands that a trial court exercise caution in admitting statements that are the product of this relationship." *Id.* This Court has "caution[ed] the government that it should only offer this sort of evidence in rare cases and when absolutely necessary, in order to avoid impairing the attorney/client relationship, chilling full disclosure by a defendant to his lawyer, and deterring defense counsel from vigorous and legitimate advocacy*." United States v. Sanders*, 979 F.2d 87, 92 (7th Cir. 1992).

Jung argues that the attorney statements admitted in this case, unlike the statements admitted in *Harris* and *Sanders*, infringed upon the policy concerns inherent in the attorney-client relationship. In *Harris*, Harris' attorney visited with an eyewitness prior to trial and showed him pictures of Harris' brother in an attempt to develop a defense to the charge of armed robbery. *Harris*, 914 F.2d at 930. Harris' theory was that his brother had committed the crime and that he was a victim of mistaken

identity. *Id.* However, after reviewing the pictures, the witness was confident that it was Harris that he saw fleeing from the scene. *Id.* At trial, the witness testified about his conversation with Harris' attorney, and the district court admitted a statement attributed to Harris' attorney acting in his investigative capacity. *Id.* In admitting the evidence, the court explained that when Harris' lawyer met with the witness, he was "testing a theory on behalf of his client" and not "relating confidential information about his client." *Id.* at 931.

In *Sanders*, the defendant's former attorney visited two co-conspirators, who were in pretrial detention, and asked the co-conspirators whether they had given statements to the police. *Sanders*, 979 F.2d at 90. Because the visit with the co-conspirators occurred several months before Sanders was indicted, the government elicited the statements made by Sanders' attorney during his visit with the co-conspirators to establish that Sanders must have been involved in the conspiracy. *Id.* at 91. In deciding to admit the statements attributed to Sanders' former attorney, the court noted the parallel facts in *Sanders* and *Harris*:

> In both cases, the lawyer spoke to the witness in order to develop a defense strategy. Both lawyers took a calculated risk in approaching an individual who might well testify against his client. The fact that the strategy backfired does not mean that advocacy will be chilled . . . . Moreover, the testimony did not impair the defendant's privilege against self-incrimination in either case; it simply 'force[d the] defendant to present a competing explanation to the jury.'

*Sanders*, 979 F.3d at 91 (quoting *Harris*, 914 F.2d at 931). The court also emphasized that Sanders' explanation "fit in neatly with the defense theory that the other man who knew [the incarcerated co-conspirators] also knew [the

lawyer who visited the co-conspirators in jail] and was the true co-conspirator." *Id.*

We agree with Jung that the district court failed to apply the "more exacting standard [that] must be demanded for admission of statements by attorneys under Rule 801(d)(2)(D)[.]" *Harris*, 914 F.2d at 931. Unlike the attorneys in *Harris* and *Sanders*, Fox did not meet with Lamon and Isaf in an investigative capacity. The statements attributed to Fox were uttered more than five years before Jung's criminal trial.[2] This is not a case where an attorney's pre-trial tactical decisions backfired; Fox was not attempting to develop a defense strategy by meeting with Lamon and Isaf. As the government acknowledges in its brief, "Fox's statements served one purpose—that being to notify victims about the situation on behalf of the defendant as part of a strategy to be cooperative."

The government achieved the equivalent of having Jung's former attorney stand with the prosecutors and vouch for his indictment when the trial court admitted testimony that Fox had told Lamon and Isaf that (1) Jung's actions were improper and illegal, (2) Jung had concealed his trading activity from SIF's investors, (3) Jung had taken the investors' assets unbeknownst to them, and (4) Jung had written a confession. Unlike the admitted statements in *Sanders*, Fox's statements did not fit in neatly with the defense's theory of the case. Instead, the statements directly contradicted the argument that Jung reasonably believed that the investors knew about the cross-collateralization risks. From a policy

---

[2] The record does not indicate whether Fox's initial conversations with Lamon and Isaf were authorized by Jung. However, Fox became Jung's attorney a week before these conversations were initiated by Fox.

perspective, defendants will be chilled from sharing information with their attorneys, defense attorneys will be deterred from vigorous advocacy, and the attorney-client relationship will be impaired if statements like Fox's regarding Jung's criminal liability are admissible. Therefore, we agree with Jung that the district court abused its discretion in admitting the out-of-court statements attributed to Fox.

Under Rule 52(a) of the Federal Rules of Criminal Procedure, any error "that does not affect substantial rights must be disregarded" and deemed "harmless." In deciding whether the district court's error was harmless, this Court's task is to gauge "what effect the error had or reasonably may be taken to have had upon the jury's decision." *United States v. Shepherd*, 576 F.2d 719, 723 (7th Cir. 1978) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)). Only if we are convinced that the error did not influence the jury or only had very slight effect should we hold the error harmless. *Id.* at 723-24.

Jung argues that after hearing the statements attributed to Fox, the jurors had a compelling reason to make all credibility judgments in favor of the government's witnesses and to draw every inference against him. Jung claims that Fox's statements erased any chance for the jury to view Jung as a trader incurring losses struggling to get back into the black. Jung contends that Fox's statements had a significant effect on the jury and tainted the verdict. We disagree.

Jung's admissions in both an affidavit and a bankruptcy stipulation severely damaged his defense. First, the affidavit, executed by Jung, included the following admission:

> From in or about July 1994 through September 1998, contrary to the best interest of SIF and its members, and my duties as Manager, I wrongfully permitted LIT

> to deposit the Pledged Securities and other Collateral in an ETJ sub-account. This action exposed, through cross-collateralization, the SIF members' securities and cash on deposit, to liquidation by LIT to satisfy my personal trading loses and expenses posted to other ETJ sub-accounts at LIT. I did not notify SIF members or the Member Liaison L & S, of this action.

Additionally, Jung agreed not to have the approximately $21 million debt (the amount lost by SIF's investors) discharged in bankruptcy.[3] These statements defeat Jung's arguments that he did not intend to deceive the SIF's investors and that he reasonably believed the investors were on notice of cross-collateralization.

The evidence presented against Jung was overwhelming. In addition to Jung's admissions, the government introduced the testimony of a senior accountant from the United States Securities and Exchange Commission, who testified that Jung's combined trading from 1994 to 1998 was never profitable; documents and testimony showing that Jung used the SIF's investors' collateral and continued to pursue additional collateral to keep his brokerage firm in operation; the testimony of two former SIF employees, who testified that Jung reallocated trades after the fact to consolidate SIF and FFA profits; the testimony of SIF's and FFA's investors, who testified that they had received quarterly reports and trade compilations from Jung showing that their investments were profitable; trade performance compilations, which inaccurately reflected that the SIF fund had made profits of 16.4% in 1994, 4.7% in 1995, 4.6% in 1996, and 4.8% in 1997; and the testimony of SIF's and FFA's investors, who testified that Jung had

---

[3] The bankruptcy code includes a provision that makes money or property obtained by fraud non-dischargeable.

never told them about his trading losses or that their collateral was in jeopardy.

Because of Jung's admissions and the overwhelming body of evidence presented by the government establishing that Jung did not disclose to SIF's investors that he was losing millions of dollars or that the investors' collateral was being used to cross-collateralize his personal trading, we are convinced that the jury's decision was not substantially swayed by the admission of Fox's statements. Therefore, we conclude that the district court's error was harmless.

## B. Application of 18 U.S.C. § 3553(a)

We use a non-deferential standard of review when determining whether the district court followed proper post-*Booker* sentencing procedures. *United States v. Rodriguez-Alvarez*, 425 F.3d 1041, 1046 (7th Cir. 2005). However, our review of a district court's application of § 3553(a) sentencing factors is deferential. *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005).

In imposing a sentence post-*Booker*, district courts are required to calculate the proper guideline range even though the guidelines are no longer mandatory. *Mykytiuk*, 415 F.3d at 607. The court must then give the defendant an opportunity to point out any § 3553(a) factors that might warrant a sentence outside of the guidelines range and must consider those factors when determining the sentence. *United States v. Dean*, 414 F.3d 725, 729-30 (7th Cir. 2005). Finally, the district court must articulate the factors that determined its chosen sentence but need not expressly address each of the § 3553(a) sentencing factors. *United States v. Williams*, 425 F.3d 478, 480 (7th Cir. 2005). "It is enough that the record confirms that the judge has given meaningful consideration to the section 3553(a) factors." *Id.*

In determining Jung's sentence, the district court complied with post-*Booker* sentencing procedures. Jung first argues that the court improperly emphasized the more severe penalties contained in the 2004 Guidelines causing an unwarranted sentencing disparity under § 3553(a)(6). Although the court reviewed the current Guidelines to "give some insight" into gauging the seriousness of Jung's offense, the Court acknowledged that "it would be very unfair to apply" the 2004 Guidelines. The district court correctly determined that the sentencing range was 97 to 121 months under the 1997 Guidelines and recognized the range as advisory.

The district court then gave both Jung and his attorney the opportunity to discuss the § 3553(a) sentencing factors and present reasons for imposing a sentence outside of the advisory range. Jung's attorney discussed Jung's record of charitable works, letters that were written on Jung's behalf, and Jung's exemplary life. Jung's attorney also emphasized Jung's cooperation with government agencies, the CBOE, and SIF's investors in their lawsuit against LIT.

The district court considered the § 3553(a) factors and identified the factors that he was taking into consideration in determining Jung's sentence. The district court discussed the nature of the offenses and the need to impose a sentence that reflects the seriousness of the offenses, promotes respect for the law, and provides just punishment. The district court also addressed the need to afford adequate deterrence to criminal conduct such as financial crimes. Although Jung acknowledges that the district court judge stated that he was "going to apply all of the criteria that are set out in 3553(a)," Jung questions whether he actually did. Specifically, Jung contends that the court failed to consider Jung's history and characteristics. This is not true. The district judge specifically stated that he was taking into account the fact that

Jung had no criminal record in determining the sentence and explained that he was sentencing Jung to the midpoint of the sentencing range because of "counterbalancing factors." The court explained that these factors included the seriousness of the offenses versus Jung's recognition of causing the loss and efforts to be helpful with Fox.

Jung's final argument is that the court failed to consider Congress' preeminent command that a sentencing court "shall impose a sentence sufficient, but not greater than necessary" to comply with 18 U.S.C. § 3553(a)(2). This Court's role is not to chose between possible sentences but rather to review the reasonableness of the sentence imposed by the district court. *United States v. Lopez*, 430 F.3d 854, 857 (7th Cir. 2005). Because the district court considered and adequately discussed the factors in § 3553(a), chose a sentence within the advisory range of the 1997 Guidelines, and adequately explained the reasoning for sentencing Jung to the midpoint of the sentencing range, Jung's sentence was reasonable.

## III.  Conclusion

For the reasons stated above, we AFFIRM the sentence of the district court.

A true Copy:

       Teste:

                            _____

                            *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*