**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Sandra McCARTHUR, Defendant–Appellant.**

No. 92–2340.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 29, 1993.

Decided Oct. 12, 1993.

Eddie Stevens (argued), Office of U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, App. Div., Chicago, IL, for U.S.

Richard L. Kagan, Anthony M. Petrone (argued), Chicago, IL, for defendant-appellant.

Before FLAUM, MANION and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

A jury convicted Sandra McCarthur of possessing three kilograms of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). McCarthur contends that the cocaine was obtained in violation of her Fourth Amendment right to be free from unreasonable searches and seizures, and that the introduction at trial of a statement she made regarding a prior arrest for cocaine possession violated Fed.R.Evid. 404(b) and her Fifth Amendment right to a fair trial. We affirm the district court.

## I. FACTS

On the afternoon of September 27, 1991, Officer Michael Bobko and Detectives Andrew Abbott and Thomas Kinsella, all of the Drug Enforcement Administration Transportation Task Force, were posted at Chicago's Union Station. Bobko is a twenty-three year veteran of the Chicago Police Department and has been a member of various narcotics investigation units since 1972. Abbott has worked for the Chicago Police Department for twenty-one years, sixteen of which have involved narcotics investigation. All three officers were in plain clothes, and their weapons were hidden. On that afternoon, they were assigned to observe passengers disembarking from Amtrak Train No. 4 from Los Angeles. The DEA has determined that Los Angeles is a source city for the importation of cocaine into the Midwest, and that Train No. 4 is the single most frequently used means of transporting illegal narcotics to the Chicago area. The officers did not, however, have prior information that any particular

passenger on the train that day was carrying drugs.

When the train arrived and the passengers began to disembark, Bobko and Abbott simultaneously noticed that Sandra McCarthur was walking more slowly than the other passengers, that she frequently glanced over her shoulder, and that she was having trouble carrying a nylon tote bag, which appeared to be more heavily weighted on one side than the other. They also observed that McCarthur repeatedly flicked her nostrils, a habit Bobko thought indicative of nasal cocaine use. Bobko caught Abbott's attention and made a gesture indicating that he noticed they had both been observing the same individual. The officers continued to watch McCarthur as she walked to the ticket area, noting that she stopped several times to place the tote bag on the floor and rest her back against a wall, each time looking around nervously at the people moving through the station. She then got into line at the ticket counter, purchased a ticket with cash, placed the ticket in her purse, and turned to walk back down the hallway in the direction from which she had come. Bobko spoke briefly with the ticket agent who had sold McCarthur the ticket, discovering that McCarthur had bought a ticket to Detroit with cash and that she had not identified herself because it was not required. The officers then decided to approach McCarthur and question her.

Bobko and Abbott came abreast of McCarthur on her left and casually matched her stride. Kinsella remained approximately ten to fifteen feet behind them to observe. When McCarthur looked in Bobko's direction, he displayed his badge and photo identification and said in a conversational tone, "I'm a Chicago police officer. Can I talk to you for a minute?" McCarthur stopped abruptly, put the tote bag down between her ankles, looked rapidly between Bobko, Abbott, and the tote bag, and then replied, "Sure."

Bobko asked McCarthur whether she had been on Train No. 4 and if she would show him her ticket stub. McCarthur confirmed that she had just gotten off Train No. 4, which she had boarded in Los Angeles, and she opened her purse to take out the ticket stub. Bobko and Abbott both noticed that McCarthur appeared to be very nervous, that her posture was unusually rigid and her hands were shaking, and that the pulse in her neck was visibly pounding. McCarthur's ticket stub indicated that the ticket had been for a one-way trip, paid for in cash on the day of departure, and issued to a passenger named "L. Montgomery." Bobko returned the ticket stub to McCarthur and asked her if she was "L. Montgomery." She hesitated, then said that she was. Bobko asked for a piece of identification, and McCarthur claimed that she had none. When Bobko then asked her if her destination was Chicago, McCarthur replied that she was going home to Detroit, and pulled out her ticket to show it to Bobko. Bobko looked at it briefly and returned it to McCarthur.

The conversation then turned to what McCarthur had been doing in Los Angeles. She claimed that she had flown in from Detroit with her boyfriend, that they had stayed at a motel, and had taken a side trip to Las Vegas. She said that she was now on her way home to Detroit by train, and that her boyfriend would be flying back a short time later. Bobko asked why she hadn't purchased a direct ticket from Los Angeles to Detroit, and McCarthur hesitated before saying that such tickets were unavailable, a statement Bobko knew to be false. In response to Bobko's followup questions concerning some of the details of her trip, McCarthur was unable to recall her boyfriend's name, the name of the motel where they had stayed, or what they had done in Los Angeles. Bobko again asked whether she had some identification, inquiring whether a telephone bill he had noticed in her purse might have her name on it. McCarthur denied that it did, and as she pulled the envelope from her purse, a Social Security card fell to the ground. When Bobko bent down to pick it up, he noticed that it bore the name of "Sandra McCarthur." He then handed the card back to McCarthur.

McCarthur became visibly more and more nervous, avoiding eye contact with the officers and hesitating and stammering in response to Bobko's questions. More contradictions in her story emerged. First she

stated that the Social Security card belonged to her sister, then that it belonged to her girlfriend. When Bobko asked her why she had someone else's Social Security card in her purse, she did not answer. Bobko then turned his attention to her tote bag, asking whether it belonged to her and whether she had packed it herself. She claimed that her boyfriend had placed some things in it before she packed it, yet she also claimed that she was aware of all of its contents. Bobko asked whether the tote bag contained any sealed or wrapped packages, and McCarthur replied that it did not.

At that point, McCarthur asked Bobko why she was being questioned. Bobko explained that he and Abbott were assigned to conduct narcotics interdiction in the train station and that they routinely spoke to many people in the course of their work. At the suppression hearing, Bobko testified that he explicitly told McCarthur that she was not under arrest or obligated to speak with them and that she was free to go. McCarthur disputes this, claiming that she was never informed that she was not under arrest, or that she could terminate the encounter if she chose. According to Bobko, after he told McCarthur she was free to go, she asked if anyone had called them about her, and Bobko stated, "No. There's been no call on you." Bobko reiterated to McCarthur that he and Abbott were simply conducting routine drug investigations at the station, and then he asked if she had any drugs in her bag. McCarthur drew a deep breath and replied no. She then looked directly at Bobko and asked him whether he intended to search her tote bag. Bobko stated that he and Abbott would like to look in the bag but could not do so without her permission because they did not have a search warrant. McCarthur told them to go ahead and look in the tote bag. But as Bobko unzipped the bag and began to search it, McCarthur stopped him, zipped it back closed and told him that she did not want him to see the dirty laundry and other personal items it contained.

Bobko then explained to McCarthur that her bag would be detained for approximately fifteen minutes for a sniff by a narcotics detection dog, that she could leave without the bag if she wished, and that she would be given a written receipt for the bag if she chose to leave. Bobko also told her that if the dog did indicate that narcotics were present, he and Abbott would retain the bag and obtain a warrant to search it and that if narcotics were found, they would obtain a warrant for McCarthur's arrest. McCarthur hesitated a moment, then assented to a search of her bag. The search soon revealed a one-kilogram package of cocaine; and two additional one-kilogram packages of cocaine were recovered from the bag later. The cocaine and the tote bag were confiscated.

McCarthur was placed under arrest and was taken to a room for questioning. McCarthur admitted to Bobko that she had been arrested once before for possession of a small quantity of cocaine in New York state. At trial, over McCarthur's objection, the district court allowed Abbott to recount McCarthur's statement acknowledging the prior arrest. When McCarthur took the stand, she explained that the cocaine involved in that arrest had belonged to a friend and that she had been unaware of it. She also reported that the charges against her had been dropped.

## II. DISCUSSION

### A. The Denial of McCarthur's Motion to Suppress

In advance of trial, McCarthur moved to suppress the three kilograms of cocaine found in her tote bag, contending that the police had seized her person and her property without probable cause or reasonable suspicion to believe that she had committed or was committing a crime. The district court conducted an evidentiary hearing on the motion. Both Bobko and Abbott testified at that hearing, and McCarthur presented her version of events in a brief affidavit. Based on the evidence presented, the district court found that the initial encounter between McCarthur and the police had been consensual, and thus did not need to be supported by any degree of suspicion. The district court acknowledged that the consensual encounter became an investigatory stop when McCarthur withdrew her consent to a search

of the tote bag and the police told her that they would detain it for a canine sniff. However, explicitly crediting the testimony of Bobko and Abbott, the district court determined that the officers possessed the reasonable suspicion necessary to justify a brief detention of McCarthur's tote bag for a canine sniff. The court accordingly denied McCarthur's motion.

■ On appeal, McCarthur argues that at the time the police officers indicated that they would detain her tote bag for a canine sniff, she had submitted to a show of police authority sufficient to constitute an arrest under *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). Because the police did not have probable cause to arrest her at that point, McCarthur argues, the cocaine subsequently discovered in her tote bag should have been suppressed as the fruit of an illegal seizure. *See generally Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Ingrao,* 897 F.2d 860 (7th Cir.1990). In the alternative, McCarthur argues that the cocaine was discovered during an illegal investigatory stop. Because police lacked reasonable suspicion that McCarthur was involved in criminal activity at the time they detained her and her bag, McCarthur contends, the cocaine was obtained in violation of her Fourth Amendment rights and should have been suppressed.

■ We will not overturn the district court's denial of a motion to suppress unless the decision was clearly erroneous. *United States v. Withers,* 972 F.2d 837, 841 (7th Cir.1992); *United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied,* 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991); *United States v. Edwards,* 898 F.2d 1273, 1276 (7th Cir.1990). Because the Fourth Amendment inquiry is primarily a factual one, " 'we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses.' " *United States v. Williams,* 945 F.2d 192, 195 (7th Cir.1991) (quoting *Edwards,* 898 F.2d at 1276).

■ It is well-established that the Fourth Amendment does not prohibit all searches and seizures, but only those that are "unreasonable." *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *Edwards,* 898 F.2d at 1276. Moreover, not all encounters between police officers and citizens constitute "seizures" within the meaning of the Fourth Amendment. *See Withers,* 972 F.2d at 841 (citing *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968), and *Edwards,* 898 F.2d at 1277). In *Johnson,* and more recently in *Withers,* this court reviewed the three categories of police-citizen encounters and the Fourth Amendment requirements imposed on each of them:

> "The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe that a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment 'seizure,' but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment."

*Withers,* 972 F.2d at 841 (quoting *Johnson,* 910 F.2d at 1508).

■ The test for determining whether a seizure has occurred for purposes of the Fourth Amendment is expressed in objective terms: " '[A] person has been "seized" within the meaning of the Fourth Amendment ... only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)); *United States v. Teslim,* 869 F.2d 316, 321 (7th Cir.1989). Although this inquiry is highly fact-specific and requires a court to view the facts and circumstances confronting

the individual in their totality, certain factors have emerged as being probative of whether a reasonable person would have felt free to leave. These include: whether the encounter took place in a public area or whether police removed the person to another location, *see United States v. Adebayo*, 985 F.2d 1333, 1338 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993); *Withers*, 972 F.2d at 842; *United States v. Sterling*, 909 F.2d 1078, 1083 (7th Cir.1990); whether the police informed the person that she was not under arrest and was free to leave, *see Edwards*, 898 F.2d at 1276; whether police indicated to the person that she was suspected of a crime or was the specific target of police investigation, *see Adebayo*, 985 F.2d at 1339 (explaining *United States v. Borys*, 766 F.2d 304 (7th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986)); whether the person was deprived of documents without which she could not continue on her way, such as a driver's license or a train ticket, *see Florida v. Royer*, 460 U.S. 491, 501, 503, 103 S.Ct. 1319, 1326, 1327, 75 L.Ed.2d 229 (1983) (plurality opinion); *Borys*, 766 F.2d at 310; and whether there was physical touching, display of weapons, or other threatening behavior on the part of police that would communicate to a reasonable person that she was not free to end the encounter, *see Florida v. Bostick*, — U.S. —, —, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991); *Adebayo*, 985 F.2d at 1338; *Johnson*, 910 F.2d at 1509. Thus, when police approach a person in a train station, identify themselves as police officers in a non-threatening manner, and ask that person questions regarding her identity, destination, or travel plans, or even request permission to search the person's baggage in a tone that does not imply that her cooperation will be compelled, there is no "seizure" requiring Fourth Amendment scrutiny. *See Bostick*, — U.S. at —, 111 S.Ct. at 2386 (citing *Royer*, 460 U.S. at 497, 103 S.Ct. at 1323); *Withers*, 972 F.2d at 842; *Johnson*, 910 F.2d at 1508–09; *Edwards*, 898 F.2d at 1276.

The district court's determination that the initial encounter between Bobko, Abbott and McCarthur was consensual, and thus did not need to be justified by any degree of articulable suspicion, is amply supported by the record. McCarthur was approached by two officers in nonconfrontational manner in a public concourse of the train station during the late afternoon, when the station was filled with commuters. She was not asked to move to a private area of the station until the first package of cocaine was later retrieved from her bag. Bobko and Abbott were in plain clothes and did not display any weapons. They conducted the interview in a non-coercive manner. Bobko identified himself and requested permission to speak with McCarthur—he did not demand it. When McCarthur voluntarily took her ticket to Detroit from her purse and showed it to Bobko, Bobko glanced at it and immediately returned it to her. Although Bobko noticed that the Social Security card that later dropped from McCarthur's purse did not bear the same name as her used ticket stub, he did not attempt to retain the card. Moreover, Bobko specifically informed McCarthur that she was not under arrest and could leave if she chose, that their investigation was entirely routine, and that no one had "tipped" them that she was arriving on Train No. 4. The most common factors that may objectively indicate police coercion are therefore absent. The circumstances of the encounter, viewed in their totality, would not have communicated to a reasonable person that she was not free to end the questioning and continue on her way.

■ We agree with the district court that the encounter developed into an investigatory stop, and thus a Fourth Amendment seizure, when Bobko told McCarthur that her tote bag would be detained for a canine sniff. *See Withers*, 972 F.2d at 842–43. But we reject McCarthur's contention that this "seizure" amounted to a full-fledged arrest, and not merely an investigatory stop. McCarthur argues that at the moment her bag was detained for a dog sniff, she submitted to the officer's show of authority by allowing Bobko to search her bag, and that the seizure therefore meets the definition of an "arrest" as

announced in *Hodari D.,* 499 U.S. at 628, 111 S.Ct. at 1551–52.

■ The issue of whether an officer's "show of authority" amounts to an arrest, like the issue of whether an encounter is voluntary or constitutes a seizure, must be resolved according to objective criteria. *See id.* at 627–28, 111 S.Ct. at 1551. Thus, if the officers' actions in this case do not objectively amount to a "show of authority" sufficient to constitute an arrest, no amount of submission to that authority by McCarthur can convert the investigatory stop into an arrest. As a general rule, where the nature and extent of an intrusion on a person's Fourth Amendment rights may properly be described as "minimal," that intrusion is not an arrest requiring probable cause. *See United States v. Place,* 462 U.S. 696, 703–04, 103 S.Ct. 2637, 2642–43, 77 L.Ed.2d 110 (1983)..

Here, after McCarthur withdrew her initial consent to the search of the tote bag, the officers simply told her that the bag would be detained for fifteen minutes for a sniff by a narcotics detection dog. Bobko noted to McCarthur that her train to Detroit was not due to leave for another hour, and he offered to give McCarthur a receipt for the bag if she preferred not to wait while the canine inspection was conducted. In addition, before McCarthur finally consented to the search, Bobko reiterated that she did not have to allow it. Thus, contrary to McCarthur's contention, the circumstances did not amount to an arrest requiring probable cause. *See Adebayo,* 985 F.2d at 1339 (when agents asked suspect whether he was carrying drugs and if they could search his briefcase, seizure was "at most" an investigatory stop); *Withers,* 972 F.2d at 839, 842–43; *cf.*

*United States v. Verrusio,* 742 F.2d 1077, 1079–80 (7th Cir.1984) (arrest took place when suspect was escorted by several agents to small inner room of police office and continuously interrogated for one hour).[1]

■ Moreover, although the encounter had ripened into an investigatory stop when Bobko advised McCarthur that they planned to detain her bag for a canine sniff, that fact alone did not vitiate her consent to a search of the bag. *See generally Royer,* 460 U.S. at 501, 103 S.Ct. at 1326 (in context of proper *Terry* stop, defendant's voluntary consent to search of suitcases would render search valid). *See also United States v. Robinson,* 984 F.2d 911, 914 (8th Cir.1993) (detective's statement that luggage would be detained for canine sniff did not render defendant's consent to search involuntary); *Borys,* 766 F.2d at 314–15 ("the agents' statement to Borys that they meant to try to secure a search warrant for his luggage if he did not consent cannot by itself invalidate Borys' consent"). The record reveals that McCarthur's assent to the search was voluntary, untainted by any coercive conduct on the part of either Bobko or Abbott.[2]

■ The sole question remaining is whether Bobko and Abbott had the requisite reasonable suspicion to justify an investigative detention under *Terry.* To answer that question, we consider the "totality of the circumstances" as they were presented to the officer at the time of the encounter. *See United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989) (citing

---

1. McCarthur's reliance on *Hodari D.* is particularly misplaced. *Hodari D.* did not involve distinguishing an investigatory stop from an arrest. Instead, the Court was called upon to pinpoint precisely when an individual who ran from the police (and discarded contraband in the process) was "seized" in order to determine when his Fourth Amendment rights came into play. 499 U.S. at 623, 111 S.Ct. at 1549. In our case, the district court ruled that McCarthur's Fourth Amendment rights were implicated at the moment Bobko proposed to retain her bag for a canine sniff, a determination which McCarthur does not dispute.

2. McCarthur's contention on appeal that at the time her bag was seized, she should have been informed of her right to remain silent under

*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is similarly unavailing. Because McCarthur failed to raise this argument before the district court and has not demonstrated plain error, it is waived. *See, e.g., United States v. Groll,* 992 F.2d 755, 758 (7th Cir.1993). Moreover, as we have already discussed, the investigatory stop of McCarthur did not curtail her freedom to a degree associated with custodial arrest, *see Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984), and the proposed search of McCarthur's bag did not involve police interrogation. *See generally Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). McCarthur's Fifth Amendment rights under *Miranda* were therefore not implicated.

*United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981)); *Sterling*, 909 F.2d at 1083. Included in this picture are the officer's experience and his knowledge of the typical behavior of persons involved in drug smuggling. *See Sokolow*, 490 U.S. at 10 & n. 6, 109 S.Ct. at 1587 & n. 6 (noting DEA use of the "drug courier profile"); *Withers*, 972 F.2d at 843; *Sterling*, 909 F.2d at 1083–84.

We find the record to be replete with articulable facts giving rise to a reasonable suspicion that McCarthur might be carrying narcotics. McCarthur arrived from Los Angeles, a known source city for cocaine, on Train No. 4, also known as a major means of transporting narcotics to Chicago. *See Sterling*, 909 F.2d at 1084; *Edwards*, 898 F.2d at 1277. She attracted the attention of both Bobko and Abbott, who noticed that her gait was unusually slow and her posture rigid, that she struggled with her tote bag, and that she repeatedly glanced over her shoulder and flicked her .nostrils. Once Bobko and Abbott approached her, they noticed that she appeared to be very nervous and that her hands were shaking as she spoke to Bobko. *See Withers*, 972 F.2d at 843. They were soon able to determine that she had bought her ticket from Los Angeles with cash, *see Edwards*, 898 F.2d at 1277, and that it had probably been purchased under an alias. Discrepancies in the most mundane details of McCarthur's trip, such as where she stayed and what she did, began to emerge almost immediately, and Bobko knew at once that the reason she gave for not purchasing a direct ticket from Los Angeles to Detroit was false. *See Withers*, 972 F.2d at 843. When McCarthur's Social Security card fell from her purse, she first claimed that it belonged to her sister, then immediately changed her story and said that it belonged to a friend. As Bobko turned his attention to the tote bag, McCarthur became visibly more nervous, claiming that her boyfriend had placed some things in it before she packed it, yet also insisting that she was aware of all of its contents. *See id.; Edwards*, 898 F.2d at 1277. She initially consented to a search of the bag, then quickly withdrew her consent. The officers were entitled to interpret McCarthur's behavior and her contradictory and evasive responses to Bobko's questions. in light of their extensive experience in narcotics interdiction and, given the degree to which the circumstances reasonably suggested that McCarthur was carrying contraband, a limited detention within the confines of *Terry* was warranted. *See Sterling*, 909 F.2d at 1084.[3]

The officers' decision to detain McCarthur's tote bag for a canine sniff was likewise justified. A narcotics detection dog would have quickly confirmed or dispelled the officers' suspicion that the bag contained narcotics without causing undue embarrassment or disturbing its other contents. *See Place*, 462 U.S. at 707, 103 S.Ct. at 2644 (as an investigatory method, the canine sniff is *sui generis*, since it does not involve rummaging through luggage or exposing noncontraband items to public view); *Royer*, 460 U.S. at 505–06, 103 S.Ct. at 1328–29. Moreover, the proposed detention would have lasted no more than approximately fifteen minutes. *See Edwards*, 898 F.2d at 1277; *cf. Place*, 462 U.S. at 709–10, 103 S.Ct. at 2645–46 (ninety-minute detention of luggage unreasonable); *Moya v. United States*, 761 F.2d 322, 327 (7th Cir.1984) (three-hour detention of luggage unreasonable). Where the scope of the detention and the investigative technique employed is so "carefully tailored to its underlying justification," *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325, there is no Fourth Amendment violation.

## B. The Admission of Evidence of McCarthur's Prior Arrest

McCarthur also challenges the district court's decision to permit Abbott to recount during the government's case-in-chief her statement that she previously had

---

3. Our case is thus easily distinguishable from *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), where only the fact that upon disembarking from an airplane, Reid "preceded another person and occasionally looked backward at him," *id.* at 441, 100 S.Ct. at 2754, related to the suspect's particular conduct, and the other circumstances of the encounter "describe[d] a very large category of presumably innocent travelers," *id.*

been arrested in New York state for possession of a small amount of cocaine.[4] The district court allowed this testimony pursuant to Federal Rule of Evidence 404(b) to demonstrate McCarthur's intent and absence of mistake. (Trial Tr. at 99–100.) McCarthur contends that the introduction of this statement was contrary to Rule 404(b) because its underlying purpose was to cast McCarthur in a bad light—*i.e.*, to establish her propensity to commit drug offenses. McCarthur further contends that any probative value this evidence may have had was substantially outweighed by the danger of unfair prejudice, and that the district court deprived her of a fair trial by admitting it.

■ Rule 404(b) prohibits the admission of "[e]vidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Such evidence may be admitted for some other purpose, however, such as to prove the defendant's intent, knowledge or absence of mistake or accident. *Id.* In determining whether to admit evidence of prior bad acts under this rule, the district court must consider whether

"(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."

*United States v. Levy*, 955 F.2d 1098, 1102 (7th Cir.) (quoting *United States v. Zapata*, 871 F.2d 616, 620 (7th Cir.1989)), *cert. denied*, — U.S. —, 113 S.Ct. 102, 121 L.Ed.2d 62 (1992). We will sustain the ad-

mission of such evidence unless the court committed a clear abuse of discretion. *United States v. Sanders*, 979 F.2d 87, 90 (7th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 2367, 124 L.Ed.2d 273 (1993); *United States v. Cox*, 923 F.2d 519, 523 (7th Cir. 1991). "The overall, governing criterion of our analysis ... is that there must have been a principled exercise of discretion by the district court." *Sanders*, 979 F.2d at 90 (internal quotations and citations omitted).

We find that the district court abused its discretion in this case. Although the evidence was admitted to show McCarthur's intent and the absence of mistake, Abbott's testimony recounting McCarthur's statement established nothing more than the fact of a prior arrest. Abbott knew nothing about the circumstances of that arrest or the disposition of any charge. The arrest, standing alone, does not establish *conduct* on *McCarthur's* part that sheds any light on her intent or the absence of mistake with respect to the offense charged in this case. As the Tenth Circuit recently explained:

Rule 404(b) concerns the admission of evidence concerning particular acts and circumstances that would tend to indicate intent, knowledge, motive or similar permissible purposes. The mere fact that an arrest was made is not, in and of itself, a "prior bad act" which the prosecution may introduce into evidence. "Evidence of a prior arrest or the lodging of charges should not itself be admitted under Rule 404(b), since neither has been traditionally viewed as sufficiently probative of the basic question of whether the underlying act occurred." 2 David W. Louisell & Christopher B. Mueller, *Federal Evidence* § 140 at 177 (1985) (noting *Michelson v. United States*, 335 U.S. 469, 482, 69 S.Ct. 213, 221, 93 L.Ed. 168 (1948) wherein the Court

---

**4.** Abbott testified that "Detective Bobko had asked ... Miss McCarthur if she had ever been arrested for cocaine before, and she stated to Detective Bobko that she had been arrested one time previously for a small possession of cocaine in New York." (Trial Tr. at 100.) On cross-examination of Abbott, McCarthur's counsel established that Abbott and Bobko had not been able to confirm the arrest or ascertain the disposition of any charge. (*Id.* at 107.) When

McCarthur subsequently took the stand, she testified that the arrest had occurred some five years earlier. She explained that the police had found her sitting in a friend's car on top of a bag containing a small amount of cocaine. According to McCarthur, she had been unaware of the cocaine until the police discovered it, and the charge against her was eventually dropped. (*Id.* at 128–29.)

concluded that "[a]rrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty."). Rule 404(b) "pertains only to evidence of acts extrinsic to the charged crime." [*United States v.*] *Orr*, 864 F.2d [1505] at 1510 [ (10th Cir. 1988) ]. Thus, the evidence of mere arrest, ... without any evidence of the particular act or circumstance that would tend to show intent or knowledge, should not have been admitted as an "other crime[ ], wrong[ ], or act[ ]" under Fed.R.Evid. 404(b). Rule 404(b) allows evidence concerning the prior activity of a particular defendant, not simply testimony that records indicate an arrest took place.

*United States v. Robinson*, 978 F.2d 1554, 1559–60 (10th Cir.1992) (footnote omitted), *cert. denied*, — U.S. —, —, 113 S.Ct. 1855, 2938, 123 L.Ed.2d 478, 687 (1993). Thus, the relevance, if any, of McCarthur's prior arrest for possession lay in the circumstances culminating in the arrest, not the arrest *per se*. Again, the government had nothing to offer in this regard; indeed, Abbott conceded on cross-examination that he and Bobko had been unable to confirm even the fact of McCarthur's arrest. *See supra* n. 4. Ironically, it was McCarthur herself who testified as to the circumstances surrounding the arrest, but she did so only after the government was permitted to broach the subject over her objection in its case-in-chief. *See* n. 4. The government cannot now rely on her explanatory testimony to justify the admission of evidence that should have been excluded in the first instance.

Although the district court erred in admitting this evidence, we conclude that the error was harmless. The balance of the evidence against McCarthur was overwhelming. She was caught red-handed with three kilograms of cocaine in her tote bag—a large quantity clearly meant for distribution rather than personal use. Although at trial McCarthur claimed not to have known that the cocaine was in the bag, she had admitted to Bobko before the cocaine was discovered

that she was familiar with everything in the bag and that it contained her personal belongings. She also admitted at trial that she had periodically opened the bag to retrieve various items in the course of her two-day trip from Los Angeles. In view of the substantial weight of the cocaine and the observation of Bobko and Abbott that it caused the bag to tilt noticeably, it strains credulity to think that McCarthur truly did not know that the cocaine was present. On the contrary, her evasive, contradictory, and false answers to the questions Bobko and Abbott posed during the initial questioning at the train station evinced a culpable knowledge of the bag's illegal contents. Thus, we are confident that even if the district court had excluded the testimony recounting McCarthur's statement about her prior arrest, the jury would have convicted her. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *United States v. Manganellis*, 864 F.2d 528, 539 (7th Cir.1988).[5] Thus, the error did not affect McCarthur's substantial rights, *see* Fed. R.Crim.Proc. 52(a), nor did it deprive McCarthur of a fundamentally fair trial.

## III. CONCLUSION

The district court did not err in determining that McCarthur's Fourth Amendment rights were not violated by police when they approached McCarthur and sought her voluntary cooperation in answering their questions, or when they sought to briefly detain her bag for a canine sniff on the basis of reasonable suspicion that it contained illegal narcotics. Furthermore, although the district court abused its discretion in admitting into evidence McCarthur's statement to the police concerning her prior arrest for cocaine possession, the error was harmless. We therefore affirm the district court.

AFFIRMED.

**5.** We note, as well, that the government did not belabor the matter of McCarthur's prior arrest. Indeed, to the extent the incident received any-

thing more than minimal mention, it was due in large part to McCarthur's testimony explaining the circumstances of the arrest.