UNITED STATES of America, Plaintiff,

v.

Floyd LOYD, a/k/a L. Morris, Defendant.

No. 93 CR 0265.

United States District Court,
N.D. Illinois, E.D.

Nov. 9, 1993.

Pamela Pepper, U.S. Attys. Office, Chicago, IL, for plaintiff.

Bryant K. Calloway, Law Offices of Miltos C. Grimes, Santa Ana Heights, CA, for defendant.

## OPINION AND ORDER

NORGLE, District Judge.

Before the court is defendant Floyd Loyd's ("Loyd") motion to suppress evidence seized by the United States of America (the "Government") and any statements made by Loyd.[1] For the following reasons, the motion is denied.

1. A defendant who seeks to suppress certain evidence must establish a *prima facie* showing of

### BACKGROUND

On December 15, 1992, John Manna ("Manna"), an agent of the Drug Enforcement Administration ("DEA"), observed Loyd board a flight at John Wayne Airport, Santa Ana, California.[2] Manna knew that Loyd was an associate of narcotics trafficker under investigation. The flight was bound for Chicago, Illinois on Delta Flight 1488 and scheduled to arrive at Chicago O'Hare International Airport ("O'Hare") later that day at 11:58 pm. Manna learned from a Delta employee that Loyd was flying under the name of L. Morris. He further learned that Loyd had checked two bags bearing claim numbers 887831 and 887832.

Subsequently, Manna contacted the DEA Transportation Group at O'Hare and related the information he had learned about Loyd. Manna also supplied a detailed physical description of Loyd: that he is a black male, approximately sixty-years old and six-foot-one-inch in height, that he was wearing a grey baseball cap, blue jeans, blue windbreaker, and white hightop sneakers, and that he was carrying a black carry-on bag.

On December 17, 1992, at 12:01 am, Delta Flight 1488 arrived at O'Hare. Task Force Agents Jamie Benvenuti ("Benvenuti"), Tom Granias ("Granias"), and Pam Triner ("Triner") (collectively "officers") observed a black male passenger fitting the description of Loyd alight from Flight 1488. After Loyd deplaned, he looked around the concourse area and proceeded to the baggage pickup area. As Loyd proceeded to the baggage claim area, he repeatedly glanced over his shoulder. At the baggage area, Loyd picked up two brown soft-sided bags.

As Loyd cleared the security gate at the baggage area, the officers, who were in plain clothes, approached Loyd and identified themselves as Chicago police officers. Following the identification, Benvenuti asked Loyd if he would speak with her and her partners. Loyd agreed to speak with the officers. After Loyd gave his permission, Benvenuti asked Loyd if he would show her his plane ticket. Loyd responded that he would and produced his plane ticket. The plane ticket was for a one-way flight from Santa Ana, California to Chicago, Illinois through Salt Lake City, Utah for a passenger name L. Morris. Benvenuti asked Loyd if his name is L. Morris and Loyd responded in the affirmative. The ticket was returned to Loyd.

After Benvenuti returned the ticket, she inquired as to the purpose of Loyd's visit to Chicago, the duration of his visit, and the address of the place he will be staying in Chicago. Loyd responded that he came to Chicago to visit his aunt for two days, but he was unable to answer as to where his aunt lived.

The officers told Loyd that they were Task Force Agents working with the DEA's Airport Interdiction Unit and were investigating narcotics trafficking. Thereafter, Benvenuti requested permission from Loyd to search his bags. Loyd gave his permission to search the carry-on bag, but refused as to the two brown bags. As a result of the search of the carry-on bag, Benvenuti discovered Loyd's real name by reading his medication box and his hotel information. Benvenuti asked if his name is Floyd Loyd and he indicated "yes." Benvenuti asked Loyd why he was travelling under the name of L. Morris. Loyd answered that he had troubles with his driver's license. Initially, however,

---

illegality. *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir.1992). Loyd fails to identify the statements he wishes to suppress and further fails to present any evidence to demonstrate that certain statements were obtained illegally. Thus, the motion to suppress "any statements made at the time of his detention or arrest" is denied without discussion.

2. The following uncontested facts are drawn from the pleadings and the affidavit of Chicago Police Officer Pam Triner prepared in support of the request for a search warrant. This affidavit was attached to Loyd's motion to suppress. No other affidavits were supplied by Loyd challenging the facts set forth in Officer Triner's affidavit or providing an alternative version of the facts. Thus, an evidentiary hearing is neither requested or necessary. The Government indicated that its facts are supported by "a December 18, 1992 draft report of investigation prepared by Task Force Agent Jamie Benvenuti" and that a copy of the report is attached to the Government's response to the motion. The response, however, was filed without the report.

Loyd had claimed that he had no identification.

Benvenuti again requested Loyd's permission to search the two brown bags. The claim numbers for the bags matched the numbers supplied by Manna. When Loyd still declined to give his permission, the officers expressed their intentions to detain the bags for a "dog sniff" test to determine the presence of narcotics. Benvenuti informed Loyd that he could either wait until the sniff test was completed or leave the area. Loyd indicated that he did not wish to remain at O'Hare during the sniff test. One of the officers gave him a phone number to call and a receipt for the bags. The officers did not detain Loyd or his carry-on bag. Loyd left the area after receiving the receipt and the phone number.

The officers took the brown bags to the DEA office at O'Hare. A Task Force Agent Robert Herr ("Herr") was at the office with his narcotics canine, Brandy. Brandy is trained to sniff luggage, among other things, in order to detect the odor of cocaine and other controlled substances. During Brandy's service as a narcotics canine, she detected the presence of controlled substance more than twenty-five times and has a 90% accuracy rate.

Herr placed the bags among three other containers and commanded Brandy to "fetch dope." Brandy sniffed each item as instructed. When Brandy sniffed the detained bags, she indicated the odor of controlled substance.

Subsequent to the positive indication of controlled substance present inside the brown bags, Triner prepared an affidavit and obtained a search warrant to open the bags. The bags were opened and searched pursuant to a warrant. The search resulted in recovering twenty-four kilograms of 90% pure cocaine. Each bag contained twelve clear plastic packages, two pillows and fabric softener sheets.

## DISCUSSION

The Fourth Amendment protects the right of the people to be secure in their persons and property against unreasonable searches and seizures. U.S. Const. Amend. IV. With respect to "seizures" of persons, the scope of the Fourth Amendment's application includes not only traditional arrests but also encompasses brief detentions. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968) (Fourth Amendment governs "seizures" of person which do not eventuate in a trip to station house and prosecution). It is well established that a seizure occurs whenever a law enforcement authority approaches an individual and restrains his freedom of movement. *Id.; see also United States v. Mendenhall*, 446 U.S. 544, 551, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497 (1980); *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). To justify a brief detention and seizure, the accosting law enforcement agent or agents must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [such] intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880.

■ Not all personal interactions between persons and law enforcement agents, however, are considered seizures under the terms of the Fourth Amendment. *Mendenhall*, 446 U.S. at 553–54, 100 S.Ct. at 1876–77. " 'A person is 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877). Examples of contributing factors that may induce a person to believe that he was not free to leave are threatening presence of several officers, display of their weapons, physical touching of the detained person, use of forceful language or tone of voice, and the remoteness of the place of detainment. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. A police/citizen encounter which involves no restraint on the citizen's freedom of movement and liberty and conducted through the citizen's voluntary cooperation through non-coercive method is not a "seizure" within the meaning of the Fourth Amendment. *United States v. Withers*, 972 F.2d 837, 841

(7th Cir.1992) (citing *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied*, 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991)).

■ Loyd argues that he was unreasonably seized in violation of the Fourth Amendment because the officer did not have a reasonably articulated suspicion that Loyd was engaged in unlawful activity. He supports the contention by asserting that Loyd's act of looking around the concourse after he disembarked and in the baggage area does not indicate that he was engaged in criminal activity. The flaw in Loyd's argument is that he assumes that he was "seized" within the meaning of the Fourth Amendment.

The uncontested facts demonstrate that the initial inquiries were conducted by three officers in plain clothes in a non-coercive public place: the concourse near the baggage claim area at O'Hare. *See United States v. Sterling*, 909 F.2d 1078, 1083 (7th Cir.1990) (baggage claim area at Midway Airport deemed non-coercive public place). The officers approached Loyd, properly identified themselves, and requested his permission to speak with him. The officers did not summon Loyd's presence or demand his compliance with the officers' requests. Loyd voluntarily agreed to speak with the officers. During the interview, the officers never displayed their weapons,[3] physically touched Loyd, or use such language to indicate to Loyd that his compliance was required.

The officers conducted the interview through Loyd's voluntary cooperation. In conducting the interview, the officers did not employ coercive measures to require Loyd's compliance. Benvenuti asked about Loyd's identity, place of origin, purpose of his trip, and travel plans. Afterwards, she asked for Loyd's permission to search his bags. These questions did not rise to such level to suggest to Loyd that he was required to answer them or to imply that he was not free to leave. *See United States v. McCarthur*, 6 F.3d 1270, 1275–76 (7th Cir.1993). Loyd fails to adduce any facts or evidence to demonstrate that he was not free to leave the area, that his movement was restrained by the officers or that he felt compelled to comply with the officers' requests. Thus, the interview that took place in the concourse adjacent to the baggage claim area was a consensual interview and no "justification by any degree of articulable suspicion" was necessary. *Id.* at 1276.

■ Eventually, however, the consensual interview of Loyd developed into an investigatory stop, thus a "seizure," when Benvenuti declared that his two brown bags will be detained for a canine sniff to determine the possible presence of narcotics. *See United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983) (seizure occurred when detainee refused consent to search luggage and agents stated that luggage will be held); *Sterling*, 909 F.2d at 1083 (encounter ripened into investigatory stop when officers advised defendant that her bag will be detained for canine sniff). To determine whether such seizure was justified, "the totality of the circumstances" surrounding the seizure must be considered. *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *McCarthur*, 6 F.3d at 1277–78.

■ Viewing the totality of the circumstances, the court finds that the officers possessed sufficient facts to articulate reasonable suspicion that Loyd was involved in narcotics trafficking. The officers had information from Manna that Loyd was "an associate of known narcotic traffickers ... under investigation" flying in from a source city. Deft.'s Mot. to Suppress at 2. Loyd looked around the concourse upon deplaning and again looked around before and after retrieving his bags. Also, the officers observed Loyd glancing over his shoulders while walking through the concourse towards the baggage claim area. When Loyd retrieved his bags, he spent considerable amount of time checking the bags' claim numbers with his claim ticket numbers.

---

**3.** The facts do not reveal whether the officers were even armed at the time of the consensual   interview.

In addition to Loyd's behavior after he alighted from the plane,[4] his responses to Benvenuti warranted further investigation. Loyd was carrying a carry-on bag and two brown soft-sided bags at the time of the consensual interview. When Benvenuti asked to see Loyd's ticket, he produced a one-way ticket from Santa Ana, California to Chicago, not a round-trip ticket. Yet, Loyd stated that he flew into Chicago to visit his aunt for a mere two days. Further, Loyd did not know or divulge information about his aunt's address, and he stated that he planned to call his aunt from his hotel.

Loyd could not produce an identification, but initially represented that his name was L. Morris. The officers discovered that that representation was false. When Benvenuti searched Loyd's carry-on bag, she noticed that his medication box listed the name of Floyd Loyd. Loyd attempted to explain the discrepancy by saying that he had troubles with his driver's license.

Any of these factors is not by itself indicative of any criminal conduct and may be consistent with innocent travelling habit.[5] However, these factors taken together with Loyd's lies and inconsistent responses amount to reasonable suspicion that Loyd was involved in narcotics trafficking. The officers acted in the least intrusive way by detaining only the two bags yet to be inspected and informing Loyd that he was either free to leave O'Hare or wait until the canine sniff was completed. *See Sterling*, 909 F.2d at 1084 (investigative detention must be properly limited in scope) (citing *Place*, 462 U.S. at 706, 103 S.Ct. at 2644; *United States*

*v. Edwards*, 898 F.2d 1273, 1277 (7th Cir. 1990)). The officers provided Loyd with the number to call and a receipt for the luggage. Thus, the seizure of the luggage was justified.

■ Loyd also argues that the search warrant issued in this case was invalid because the affidavit submitted in support of the request for a warrant lacked probable cause. The court finds this argument meritless.[6] Triner's affidavit contained sufficient facts to support Magistrate Judge Bobrick's finding of probable cause and issuance of the search warrant. "A search warrant may be issued only if it appears from the ... affidavit filed in support of it that there is probable cause to believe that an offense has been committed and that the defendant has committed it." *United States v. McNeese*, 901 F.2d 585, 592 (7th Cir.1990). An affidavit makes a sufficient showing of probable cause if the alleged facts in the affidavit "induce a reasonably prudent person to believe that a search thereof will uncover evidence of a crime." *Id.* (citing *Berger v. New York*, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967)). Probable cause does not require certainty; rather a reasonable probability.

In addition to the factors already discussed, the sniff-test result supports the finding of probable cause and the issuance of the search warrant. Brandy is a trained and certified narcotics canine with a 90% accuracy rate. Brandy detected an odor of controlled substance emanating from Loyd's bags when commanded to "fetch dope" from five containers placed in the DEA office.

---

**4.** The fact that Loyd's behavior may have met the drug courier profile alone does not support the finding that the seizure was justifiable.

**5.** Loyd argues that "[t]ravelling under a name other than his true name is neither criminal nor in and of itself indicative of criminal conduct as a significant segment of the population travel under names other than [their] own for a host of reasons ranging from cheating husbands, to persons taking advantage of another's frequent flyer mileage, to businesspersons who may do so for security reasons." Deft.'s Mot. to Suppress at 8. As to the fact that Loyd was looking around and glancing over his shoulder, defendant suggests that "the most logical explanation is that he may have simply been looking for the person he ex-

pected to meet his plane." Deft.'s Mot. to Suppress at 9. "As to looking around as he proceeded to the baggage claim area Defendant could have simply been trying to ensure that if the person he expected to meet his plane wandered off or was late that he did not pass miss [sic] him or her as he walked to the baggage claim area." Deft.'s Mot. to Suppress at 9.

**6.** Having found that the initial interview was a consensual interview not requiring any degree of reasonable suspicion, Loyd's argument that the seized evidence must be suppressed on the grounds that it was seized as a result of an illegal stop and seizure of Loyd does not warrant any further discussion by the court.

In sum, the initial contact between the officer and Loyd in a public concourse adjacent to the baggage claim area at O'Hare was a consensual interview. The consensual interview did develop into an investigatory stop; however, the officers had reasonably articulated suspicion to detain the two brown bags for a canine sniff test. Additionally, Triner's affidavit contained adequate information to justify the finding of probable cause.

## CONCLUSION

For the foregoing reasons, Loyd's motion to suppress evidence seized by the Government is denied.

IT IS SO ORDERED.