70 F.3d 1275
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kelvin L. SHELTON, Defendant-Appellant.
 No. 95-2070.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 5, 1995.
Decided Nov. 29, 1995.
 
 Before EASTERBROOK, MANION and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Kelvin Shelton appeals his conviction for possession of cocaine base with intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1). Specifically, Shelton challenges the district court's denial of his motion to suppress evidence of narcotics that was found on his person during an airport encounter with police. Because the district court did not commit clear error in finding that Shelton consented to a search by police and that Shelton never withdrew that consent, we affirm.
 
 Background
 
 2
 On September 21, 1994, Shelton arrived at the Indianapolis International Airport on an early morning flight (a red-eye) from Los Angeles. As he deplaned and walked down the concourse, he was observed by Indianapolis Police Detectives Gerald Ross and Ray Potter, investigators in the narcotics unit working interdiction cases at the airport. Shelton was wearing a rather heavy jacket for that time of year.
 
 
 3
 As is usually the situation in these airport/train station encounters, the police had various suspicions to create a profile. The agents noticed not only Shelton's heavy coat, but also that he was the only passenger wearing any kind of a jacket. When the agents made eye contact with Shelton while he walked through the concourse, Shelton quickly looked away. The agents observed Shelton walking through the airport in a nervous and hurried manner.
 
 
 4
 After Shelton proceeded past the baggage claim area and out the exit door of the terminal, Ross approached him. Ross identified himself as a police officer and showed Shelton his badge. From that point forward, Shelton appeared to be cooperative. He agreed to talk and, upon request, showed Ross a California driver's license and a one-way plane ticket paid for in cash. Shelton agreed to accompany Ross back inside the terminal and to consent to a search. Initially, the search was unproductive.
 
 
 5
 At some point during the search, Shelton noticed his baggage coming on the conveyor belt and he suggested that he go retrieve it. Shelton went and picked up his bag, brought it back, and then allowed Ross to search it. The baggage search revealed nothing. There is some discrepancy in the testimony, but Shelton apparently allowed Ross to continue the search of his person. Although Shelton protested that he had already been searched, he never told Ross that he did not want to be searched again. Ross then searched Shelton's upper body and felt a large package inside the lining of Shelton's jacket. Ross testified that when he touched the package, a nervous and panicked look came across Shelton's face. The package contained approximately one-half pound of crack cocaine and two bags of marijuana.
 
 
 6
 The district court denied Shelton's motion to suppress, concluding that the contact between Ross and Shelton was a consensual police-citizen encounter, and thus did not constitute a seizure within the meaning of the Fourth Amendment. Under the totality of the circumstances, the court found, a reasonable person would have felt free to leave. Judge Barker also found that "consent was given, that the defendant ... did not indicate in a fashion so as to allow the officers to infer that he was withdrawing his consent." (Tr. of Suppression Hearing of 1/19/95, at 89.) Even if she were to accept Shelton's version of his conversation with Ross, Judge Barker found that Shelton's statements were "equivocal" at best and suggested nothing more than that he might want to withdraw his consent; these statements "certainly [were] not the sort of indication that binds the officers, under the totality of the circumstances, to stop, that the consensual encounter has come to an end." Id.
 
 
 7
 In April 1995, Shelton pleaded guilty to a single-count indictment of possession with intent to distribute cocaine base, while specifically reserving the right to appeal the denial of the motion to suppress. He was sentenced to 121 months in prison. Shelton now appeals.
 
 Discussion
 
 8
 This court reviews the district court's denial of a motion to suppress evidence for clear error. United States v. Nobles, --- F.3d ----, No. 94-2561, slip op. at 11 (7th Cir. Nov. 1, 1995). Because the district court was able to hear and observe the witnesses, we defer to its factual findings. We shall find clear error only if, after reviewing the evidence, we are firmly convinced that a mistake has been made. United States v. Willis, 61 F.3d 526, 529 (7th Cir.1995), petition for cert. filed (U.S. Oct. 23, 1995) (No. 95-6488).
 
 
 9
 Not all encounters between police and citizens implicate the Fourth Amendment's prohibition on unreasonable searches and seizures. United States v. Rodriguez, --- F.3d ----, No. 94-3935, slip op. at 8 (7th Cir. Oct. 23, 1995). This court has discussed the degree of suspicion required under the Fourth Amendment for three categories of police-citizen encounters: (1) an arrest, requiring the police to have probable cause; (2) an investigatory stop, requiring the police to have specific and articulable facts sufficient to give rise to a reasonable suspicion; and (3) a voluntary cooperation initiated by non-coercive police questioning. United States v. McCarthur, 6 F.3d 1270, 1275-76 (7th Cir.1993). " 'With regard to the third category, the consensual encounter, the degree of suspicion that is required is zero.' " Nobles, slip op. at 12 (quoting United States v. Withers, 972 F.2d 837, 841 (7th Cir.1992)).
 
 
 10
 Shelton's principal argument on appeal is that his consensual contact with the police ended once Ross asked him to come back inside the terminal. At that point, Shelton contends, he did not feel free to leave, and Ross' actions thus constituted an unlawful seizure.
 
 
 11
 We apply an objective standard in determining whether an airport encounter between a citizen and police represents a "seizure." Rodriguez, slip op. at 9. "[A] person has been 'seized' within the meaning of the Fourth Amendment ... only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." McCarthur, 6 F.3d at 1275 (internal quotations and citations omitted). Although this is a highly fact-specific inquiry requiring a court to view in their totality the facts and circumstances facing the individual, certain probative factors provide guidance for determining whether a reasonable person would have felt free to leave. Id. at 1275-76. These factors include whether the encounter took place in a public area or whether police removed the person to another location; whether the police informed the person that he or she was not under arrest and was free to leave; whether the police informed the person that he or she was suspected of a crime or was targeted by the police for investigation; whether the person was deprived of documents that he or she needed to continue traveling, such as a driver's license or train ticket; or whether there was physical touching, display of weapons or other threatening behavior on the part of the police that would convey to a reasonable person that he or she was not free to depart. Id.
 
 
 12
 The district court's finding that the encounter between Shelton and Ross was consensual, and thus did not need to be justified by any degree of articulable suspicion, is supported by the record. Shelton was initially approached by Ross in a nonconfrontational manner outside the airport terminal near the baggage claim area, a public place. Not until after the drugs were discovered was Shelton asked to move to a private area of the airport, the airport police office. After examining the various documents, Ross returned all of them and never suggested to Shelton that he was a criminal suspect. Shelton consented to speak to Ross and agreed to searches of both his person and his luggage.[1] Ross did not display any weapons or touch Shelton until he conducted a search later inside the terminal. Although Ross did not advise Shelton that he was free to decline his requests or otherwise terminate the encounter, the failure to give such an advisement does not necessarily eliminate the consensual nature of the encounter. See INS v. Delgado, 466 U.S. 210, 216 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."). The police do not violate the Fourth Amendment by merely approaching a person in an airport and asking routine questions regarding identification, airline ticket information, nature and length of the recent air travel, and whether the person would consent to a search of baggage. Rodriguez, slip op. at 9; United States v. Withers, 972 F.2d 837, 841 (7th Cir.1992); see also McCarthur, 6 F.3d at 1276 (train station encounter). The district court's finding that a reasonable person in Shelton's position would have felt free to leave was not clearly erroneous. See also United States v. High, 921 F.2d 112, 115 (7th Cir.1990) (Fourth Amendment not implicated by encounter of plain-clothes law enforcement officers with arriving train passenger who was free to leave and who consented to initial and subsequent questioning).
 
 
 13
 Shelton also contends that based on prior personal experience, he deemed it "imprudent" to refuse to speak with a police officer, and consequently, the apparent consent he gave was "not truly voluntary." (Shelton's Br. at 12-13.)
 
 
 14
 Although a person's subjective characteristics may be relevant to the voluntariness of the person's consent, see Schneckloth v. Bustamonte, 412 U.S. 218, 229-30 (1973), the scope of one's consent under the Fourth Amendment must be judged against a standard of objective reasonableness. See Florida v. Jimeno, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?"). Even if we were to assume that some subjective characteristics were relevant to the validity of Shelton's consent, we would reject the notion that his perceptions about the police constitute such a relevant subjective characteristic. "[A]n intangible characteristic such as attitude toward authority is inherently unverifiable and unquantifiable.... [and] [g]eneralities about attitudes are even more vaporous." United States v. Zapata, 997 F.2d 751, 759 (10th Cir.1993).
 
 
 15
 Finally, Shelton contends that even if his initial consent to the search were voluntary, he withdrew this voluntary consent after he went to retrieve his luggage. In support, Shelton points out that on more than one occasion, Ross asked him for consent to search his person. Shelton suggests that a police officer would not need to ask permission to continue a search if an earlier consent were still valid. We reject this suggestion. Multiple consent requests are not unreasonable. As we have observed, "[I]t is certainly prudent, and not inherently unbelievable, for a law enforcement agent to seek confirmation when there is an interruption following the giving of consent." United States v. Eddy, 8 F.3d 577, 581 (7th Cir.1993), cert. denied, 114 S.Ct. 1663 (1994). In any event, we construe the situation here as an "interrupted search," in which Shelton did not sufficiently protest the search resumed by the police after his bag had arrived. In fact, Shelton's consistently cooperative attitude belies any contention that his statements constituted a withdrawal of consent. Under the facts of this situation, it was not clearly erroneous for the court to find that the search was valid.
 
 Conclusion
 
 16
 The record supports the district court's conclusion that the circumstances of Shelton's encounter with the police, considered in their totality, would have communicated to a reasonable person that he was free to end the questioning and to continue on his way. The district court's denial of the suppression motion was thus not clearly erroneous. The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 We note that Shelton " 'was not an overawed youngster being confronted with law enforcement for the first time.' " Nobles, slip op. at 15 n. 10 (quoting United States v. Rice, 995 F.2d 719, 724 (7th Cir.1993)). He had four prior convictions, including one for assault with a firearm. Shelton was aware of his rights and had experience dealing with law enforcement officers